CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
3/31/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| ALEXANDER SIMS JR., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-00026 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| CAESARS VIRGINIA, LLC, | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

Plaintiff Alexander Sims ("Sims") was gambling at the Caesars casino in Danville, Virginia, when he was asked to leave. Defendant Caesars Virginia, LLC ("Caesars") says it was because he was intoxicated; Sims counters that it was because he is black. He also complains about his treatment during his removal, contending that he was denied a wheelchair when pain in his foot from a previous motorcycle accident became unbearable. And when Sims was ultimately arrested outside the casino for public intoxication, he faults Caesars for instigating that encounter with the police. He has sued Caesars, and Caesars now moves to dismiss his complaint. For the reasons discussed below, Sims's complaint must be dismissed in its entirety.

## I.    STATEMENT OF FACTS

The facts are taken from Sims's amended complaint and, for the limited purpose of ruling on the present motion, are accepted as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On June 11, 2023, Sims was at the Caesars casino with two friends. He arrived at approximately 8:47 p.m., and shortly thereafter, he went to the bar and purchased three bottles of beer: one for him, and one for each of his friends. (Am. Compl. ¶¶ 1–3 [ECF No. 11].) He claims that, while he was at the bar, a black female security guard approached his friends. (*Id.*

¶¶ 4, 17.) She walked "within feet of them near the front entrance" and "remove[d] her cell phone from her pocket." (*Id.* ¶ 5.) Approximately five minutes later, Sims ordered three shots of liquor from a waitress while he sat at a slot machine. (*Id.* ¶ 9.) At the time, he had his left foot elevated on a chair, accounting for an injury he had recently sustained in a motorcycle crash. (*See id.* Ex. B [ECF No. 11-2].) The waitress returned with his order, and Sims gave a shot to each of his friends. (*Id.* ¶¶ 9–12.) Throughout this interaction, Sims says the security guard eyed him suspiciously and in a racially discriminatory manner. (*See id.* ¶ 14.)

Shortly thereafter,[1] another Caesars employee (who is white) approached the black security guard who Sims claims was monitoring him and his friends. Sims deduces that she was speaking about him because, moments later, the white security guard approached and asked for his identification ("ID"). (*Id.* ¶¶ 17–18.) Because the security guard did not identify herself, Sims refused, asking: "Who are you?" (*Id.* ¶¶ 17–19.) She "replied with a hand gesture," then repeated, "I need to see your ID[.]" (*Id.* ¶ 20.) Sims responded, "If you need my name, it's right here on the machine, because my membership card is inserted." (*Id.* ¶ 21.) Unsatisfied, the guard said, "It doesn't matter. I need to see your ID because of the card you used." (*Id.*) Sims requested her supervisor, but she told him, "I am the supervisor." (*Id.* ¶ 22.) Sims explained that she had not identified herself and "nothing on her clothing showed that she was even a Caesars employee."[2] (*Id.* ¶ 23.) Again, Sims demanded a supervisor, but he

---

[1] Sims clearly omits information from his Amended Complaint. The surveillance video that he attached to his Amended Complaint shows an in-depth, approximately seven-minute conversation between Sims, the waitress, and at least two other Caesars employees prior to the security guard approaching Sims. (*See* Am. Compl. Ex. B.)

[2] This allegation is plainly belied by the video footage; the guard was dressed exactly as the other security personnel at Caesars, and she had what appears to be an ID card hanging around her neck. Sims admits as much in that he alleges that, later, he tried to take a picture of her "name tag." (Am. Compl. ¶¶ 27–28.)

eventually relented and presented his ID. (*Id.* ¶ 25.) When the guard tried to take a picture of it, Sims balked, "withdrew [his] ID and asked, '[W]hy are you trying to take a picture of my ID?'" (*Id.* ¶ 26.) Sims told the guard she was "acting shady" and tried to take a picture of her nametag, but she covered it. (*Id.* ¶¶ 27–28.) He also advised the guard that he had gotten his card back from the waitress. (*Id.* ¶ 27.)

Sims claims that the guard's "posture and attitude became defensive," and they continued to argue over Sims's ID. (*Id.* ¶¶ 29–31.) The guard requested assistance via radio, and at that point, "[a] [p]erson looking more like a legitimate Caesars employee passed by," and Sims stopped him and showed him his ID. (*Id.* ¶ 33.) As the other person held Sims's ID, the guard was able to take a picture of it, albeit without Sims's consent. (*Id.* ¶ 34.) Sims then "extended [his] arm out and motioned for her to walk with [him] to the cage area so that [they] could get a supervisor. She . . . refused." (*Id.* ¶ 35.) At that time, a "[w]hite male security agent . . . walked up." (*Id.* ¶ 36.) Sims, who assumed the male security guard was the female security guard's supervisor, explained his concerns regarding the female security officer taking a picture of his ID, and the male security guard also stated that "she was his supervisor." (*Id.* ¶¶ 38–39.) Sims explained how suspicious it was that she was trying to take a picture of his license as the waitress had just returned his credit card. (*Id.* ¶ 41.) Sims claims that, at this point, the female security guard said that "someone had complained about [him] and that's why she needed to see [his] driver's license." (*Id.* ¶ 42.) When Sims asked the nature of the complaint, she "switched and said that [he] was too intoxicated and that [he] needed to leave." (*Id.* ¶¶ 43–44.)

---

Moreover, the surveillance video footage plainly shows Sims interacting with an identically dressed male security guard when he entered the casino. (*Id.* Ex. A.)

Sims turned back towards the machine and, when he did so, the female security guard stated, "[N]ow your black ***** is banned[.]" (*Id.* ¶ 45.) Sims was shocked by her statement; he advised that she was "embarrassing" him and asked to speak somewhere private, but she advised him that he needed to leave. (*Id.* ¶ 46.)

Another security guard—a black male—approached, and Sims walked away with the guards "to go find a supervisor." (*Id.* ¶¶ 47–48.) On the way, Sims stopped at a table game and asked the dealer to "summon the man in the suit behind him assuming he was a supervisor." (*Id.* ¶ 49.) "The man in the suit . . . told [Sims] that [the female security guard with whom he had been dealing] was the supervisor and brushed [him] off." (*Id.* ¶ 51.)

At this point, "[t]he pain in his foot was becoming extreme so [he] sat down."[3] (*Id.* ¶ 50.) Sims asked for a wheelchair, but was denied, and someone told him that he "walked this far [he] might as well walk the rest of the way." (*Id.* ¶¶ 52–53.) Sims advised that he "had not planned on coming and walking around the casino, that's why [he] had [his] foot propped up while [he] was gambling." (*Id.* ¶ 54.) Again, he was told that he had "walked this far" so he "might as well keep walking." (*Id.* ¶ 56.) Sims again requested a wheelchair and was again denied. (*Id.* ¶ 57.) So Sims began walking again, but slowed down due to the pain; the black male security guard then pushed Sims "with his left shoulder and arm." (*Id.* ¶ 58.) Sims stopped and *again* asked for a wheelchair, but this time he took his left shoe off "because the swelling was getting intense and the pain was making it unbearable to walk. [He] showed the three security agents that [he] had a hospital sock on and that blood and drainage was beginning to

---

[3] Sims had been in a motorcycle accident on or about May 13, 2023, resulting in "[s]crapes to [his] left lower extremity" and a wound to his foot. (Am. Compl. ¶ 55 & Ex. B.)

appear on the sock near the left outer aspect of [his] foot." (*Id.* ¶ 59.) But even after seeing his injured foot, the security guards "still refused to get [Sims] a wheelchair as requested." (*Id.* ¶ 60.) After waiting several minutes for the pain to subside—and being continually ridiculed and told to continue walking—Sims put his shoe back on and "walked to another security guard at the main entrance." (*Id.* ¶ 61.) *Again* he asked for a supervisor and *again* he was advised that the female security guard *was* a supervisor. (*Id.* ¶ 62.) Sims finally exited the casino.

Once outside, Sims "was unable to walk any further[4] because of the pain in [his] foot," so he handed his keys to one of his friends so that the friend could pull Sims's vehicle to the front of the building. (*Id.* ¶ 63.) At the same time, the black male security guard began speaking to two police officers who were on site, and they "immediately summoned" Sims. (*Id.* ¶¶ 64–65.) According to Sims, the female security guard "instigated, advised, and encouraged" both the black male security guard "to provide police with false allegations," although Sims does not allege what was said. (*Id.* ¶ 66.) The police officers told Sims that Caesars is private property, that it "was not their jurisdiction," that "whatever the security guard said goes," and that he was free to leave. (*Id.* ¶ 69.) But given that he believed the security guards had told the police he was intoxicated, he did not want to drive and risk being pulled over. (*Id.* ¶ 72.) He asked to be breathalyzed to show that he was "not 'too' intoxicated," but the police refused his request. (*Id.* ¶ 71.) So he called his sister and asked her to come drive his pickup (and presumably him) home. (*Id.* ¶ 73.) "Both officers said that was fine" and that they would wait until his sister arrived. (*Id.* ¶ 74.) He spoke generally with the officers, explaining his injuries

---

4 The security camera footage belies this assertion; Sims was walking just fine for 10–15 minutes. (*See* Am. Compl. Ex. A.)

and showing them pictures. (*Id.* ¶¶ 75–77.) His friend pulled up with his truck and held his license out to show to one of the officers, but Sims "informed him that none of [them] were driving [his] truck, [his] sister(s) were on the way to the casino to drive it home." (*Id.* ¶¶ 79–80.) Unbeknownst to Sims, although he instructed his friend to park his truck, his friends "had left the parking lot, crashed, and fled the scene on foot." (*Id.* ¶ 83.) Shortly thereafter, Sims was arrested for public intoxication,[5] and he contends that "[t]he false allegations made by" Caesars security guards "were the proximate cause of the arrest." (*Id.* ¶ 85.)

Sims brought suit in this court on May 20, 2025. After being served, Caesars filed a motion to dismiss Sims's original complaint. (ECF No. 6.) As is his right, Sims filed an Amended Complaint, which Caesars now moves to dismiss. The parties fully briefed the motion, and it is ripe for disposition.[6]

## II.    STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering

---

[5] Sims omits that he was also charged with resisting arrest without force. *See Commonwealth v. Sims*, Case No. GC23003611-00 (Va. Gen. Dist. Ct., filed June 14, 2023). All charges against Sims were *nolle prossed.*

[6] The court dispenses with oral arguments because it would not aid the court in deciding the straight-forward issues presented by Caesars' motion.

"labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement[,]'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557). When evaluating the sufficiency of a complaint, the court is obligated to consider the factual allegations asserted in the complaint as well as any exhibits attached thereto. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing Fed. R. Civ. P. 10(c)).

In this case, Sims is proceeding *pro se*. "A document filed *pro se* is 'to be liberally construed,' . . . and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). *Cf.* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").

## III.   DISCUSSION

In his amended complaint, Sims asserts four causes of action: racial discrimination under 42 U.S.C. § 1981 (Count One); joint action with state actors under 42 U.S.C. §§ 1981 and 1983 (Count Two); false arrest/false imprisonment under Virginia law (Count Three); and violation of Title III of the Americans with Disabilities Act (Count Four). Caesars has challenged all four causes of action, so the court will address each in turn.

a.   Count One: Racial Discrimination Under § 1981

Sims asserts that his right to contract with Caesars was denied on account of his race, in violation of 42 U.S.C. § 1981. That statute provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white persons." 42 U.S.C. § 1981(a). It defines "make and enforce contracts" to include "the making, performance,

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). "To prove a § 1981 claim, . . . a plaintiff must ultimately establish both that the defendant intended to discriminate [against the plaintiff] on the basis of race, and that the discrimination interfered with a contractual interest." *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427 434 (4th Cir. 2006). The plaintiff must plead "that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). "[T]o survive a motion to dismiss, a plaintiff must allege facts that, if accepted as true, allow the court to draw a reasonable inference as to those legal requirements." *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022).

Sims's amended complaint falls well short of this standard. Aside from the allegation that a casino employee told him that his "black ***** [was] banned" (Am. Compl. ¶ 45), Sims's allegations are wholly speculative; he "does not allege facts from which the [c]ourt could infer that, but for his race," Caesars would not have asked him to leave. *Hodge v. MGM Nat'l Harbor, LLC*, No. DBL-23-3463, 2025 WL 675050, at *4 (D. Md. Feb. 28, 2025), *aff'd* 2025 WL 3764866, at *1 (4th Cir. 2025). He assumes that he was surveilled and observed because of his race, but that assertion lacks any factual support. To the contrary, accepting his allegations as true, Sims admits that, once he was approached, he repeatedly refused the female security guard's instructions, opting instead to argue and challenge her authority.[7] Insofar as he believes

---

[7] As noted, Sims repeatedly demanded to see a "supervisor," ignoring the guard's assertions that *she* was the supervisor. As he explained throughout his Amended Complaint, many others tried to explain that to him as well (*see* Am. Compl. ¶¶ 30, 39, 51), but he apparently refused to believe it, assuming instead that *male* Caesars' employees were the supervisors. (*E.g.*, *id.* ¶¶ 38, 49.)

the security guard profiled and followed him, such "vague and conclusory allegations" are insufficient to state a claim. *Nadlendla*, 24 F.4th at 307.

Moreover, Sims has not alleged that other patrons who were equally obstinate were permitted to remain on the premises.[8] *See Hodge*, 2025 WL 675050, at *4 ("Hodge does not allege any additional information about the circumstances under which customers of other races won and ultimately were paid the Grand Jackpot. Nor does he allege that MGM consistently refused to pay African American customers who legitimately won the Grand Jackpot. Hodge's allegations are conclusory."). This pleading deficiency is fatal to his claim because it strongly implies that some factor *other than race* explains Caesars actions.

The court must also "consider the plausibility of inferring discrimination based on [Sims's] allegations in light of an 'obvious alternative explanation' for the conduct." *Woods v. City of Greensboro*, 855 F.3d 639, 649 (4th Cir. 2017) (quoting *Ashcroft*, 556 U.S. at 682). Sims's complaint "suggests other, non-discriminatory facts may have caused" Caesars to ask him to leave the premises. *Hodge*, 2025 WL 675050, at *5. As alleged, Sims's obstinacy and apparent intoxication certainly explain Caesars's scrutiny. Moreover, Sims alleges that he was told someone had "complained" about him, and that there were issues with the credit card he used to pay for the drinks. (Am. Compl. ¶¶ 21, 24.) Both constitute valid non-discriminatory reasons for approaching Sims, asking for his ID, and, when he balked, asking him to leave. On the facts alleged, Sims has failed to allege that he was ejected from Caesars "because of" his race.[9]

---

[8] Although Sims alleges in his brief in opposition that "similarly situated white customers" were treated differently (*see* Pl.'s Br. in Opp. at 3 [ECF No. 23]), that allegation is nowhere in his Amended Complaint.

[9] In his Amended Complaint, Sims refers to "intraracial discrimination," apparently contending that he was targeted by the black security guard because of perceived difference in his "skin tone, hair texture, [or] cultural

Sims resists this conclusion, arguing that the security guard's allegedly racist statement is sufficient to state a claim. He cites *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004), for the proposition that "courts have repeatedly held that such remarks can sustain a § 1981 claim," but that is not what *Williams* says. (Pl.'s Br. in Opp. at 3 [ECF No. 23].) In *Williams*, the plaintiff's claim of discrimination was not based on the alleged use of a racial slur; rather, it involved a concrete allegation that the store refused to cash his out-of-state check after doing the same for a white customer just minutes before. 372 F.3d at 668 ("It is undisputed . . . that Staples accepted the out-of-state check of Williams's white classmate on the same day that Staples rejected Williams's out-of-state check."). Unlike the plaintiff in *Williams*, Sims has not alleged any facts that would constitute circumstantial evidence of discrimination or would show that other patrons were treated differently. *See Hodge*, 2025 WL 675050, at *4. Under all the facts that Sims has alleged, a single reference to his race does not permit the "court to draw [the] reasonable inference" that Sims's race was the "but-for" cause of his removal.[10] *Nadendla*, 24 F.4th at 305. Accordingly, this claim will be dismissed.

b. <u>Count Two: Joint Action with State Actors (42 U.S.C. § 1983)</u>

Sims styles Count Two as "joint action with state actors under 42 U.S.C. §§ 1981 and 1983," but that is not a stand-alone cause of action. Rather, joint action with state actors is a theory of imposing liability under § 1983—which requires one to act under color of state law—

---

background" as compared to her. (Am. Compl. ¶ III.2.) But Sims does not offer any factual assertions to support this theory of discrimination.

[10] It is also a bit incongruous, as Sims alleges that the security guard had already asked him to leave and, when he ignored her directive, she made the statement that his "black ***** is banned." (Am. Compl. ¶ 45.)  But Sims does not allege that he was banned from Caesars, so this isolated reference to his race, although occurring in the context of his removal, goes to an action that Sims does not even alleged Caesars took.

on otherwise *private* actors. Here, Sims has not asserted a cause of action under § 1983, and since § 1981 does not require state action, *see Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436 (1968) (noting that the purpose of the Civil Rights Act of 1866 was "to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein")—and is being dismissed on other grounds—Count Two does not independently state a claim.

But giving Sims's Amended Complaint a liberal construction, he does allege that the security guard "coordinated with Danville police," who ultimately arrested Sims. (Am. Compl. ¶ II.2.) Insofar as Sims is claiming that that action violated § 1983, he is mistaken. It is well-settled that merely calling the police to report a suspected crime is not sufficient to transform a private actor into a state one such that they become liable under § 1983. *See Cruey v. Huff*, No. 7:09CV00516, 2010 WL 1539995, at *3 (W.D. Va. Apr. 16, 2010) (quoting *Collins v. Womancare, Inc.*, 878 F.2d 1145, 1155 (9th Cir. 1989)); *Lawson v. Caesars Virginia, LLC,* No. 4:25-cv-00035, 2025 WL 3657927, at * (W.D. Va. Dec. 17, 2025). Although "state action has been found to exist when circumstantial evidence shows that a private citizen 'possessed and exerted influence over the . . . police, and conspired with them to have [the plaintiff] arrested,'" *id.* (quoting *Wagenmann v. Adams,* 829 F.2d 196, 211 (1st Cir. 1987)), Sims's allegations fall well short of establishing a conspiracy between the security guard and the police officers who ultimately arrested him. At most, his complaint contains nothing more than conclusory assertions devoid of factual support. For example, he alleges that the female security guard "instigated, advised, and encouraged the police officers before, during, and after" his arrest, but he doesn't explain how. (Am. Compl. ¶ 67.) He claims that she "instigated, advised, and

encouraged" another security guard "to provide police with false accusations," but, again, doesn't specify what those false accusations are. He says that all of this is supported by Exhibit A, but Exhibit A, which lacks sound, offers no factual support whatsoever. In the absence of specific factual allegations that would support his claims, Count Two must be dismissed.[11]

     c.  Count Three: False Arrest and False Imprisonment

In Virginia, claims of false arrest and false imprisonment are the same thing. *See Smith v. Button*, No. ML-4566, 1997 WL 33621883, at *3 (Va. Cir. Sep. 24, 1997) ("The tort claim of false imprisonment is also commonly referred to as false arrest. . . . The claims . . . are distinguishable in terminology only[.]"). "False imprisonment is restraint of one's liberty without any sufficient cause therefor. It is not essential that [the person] be confined in jail or placed in the custody of an officer." *Zayre of Va., Inc. v. Gowdy*, 147 S.E.2d 710, 713 (Va. 1966). To state a claim for false imprisonment in Virginia,[12] a plaintiff must plead facts that, if true, would show that his "liberty was restrained, either by words or acts that [he] would fear to disregard, and that there was no sufficient legal excuse to justify the restraint." *Dill v. Kroger Ltd. P'ship I*, 860 S.E.2d 372, 380 (Va. 2021) (citing *Montgomery Ward & Co. v. Wickline*, 50 S.E.2d 387 (Va. 1948)). But a person may not "prevail on a claim of false imprisonment if [his] arrest was lawful[,]" even though lack of probable cause is not an element of a false

---

[11] In a separate case against the arresting officers, Sims provided their body-worn camera footage. *Sims v. Shively, et al.*, 4:25cv00027 (W.D. Va. July 21, 2025) [ECF No. 13]. Although not considered in ruling on this motion, the court notes that that footage does not support Sims's version of events either.

[12] Because Sims has failed to state a claim under § 1983, *see supra* § III.b, the court does not consider this claim under this statute. But even if it did, it would fail because, as the court recently ruled, there was probable cause for Sims's arrest. *See* Mem. Op. (ECF No. 27), *Sims v. Shively, et al.*, No. 4:25cv00027 (W.D. Va. Mar. 31, 2026).

imprisonment claim. *Id.* at 381. "A party who actively instigates, directs, or procures the unlawful arrest of a person is liable for false imprisonment." *Smith*, 1997 WL 33621883, at *3.

Sims's allegations in support of this claim fall well short. He alleges simply that the black security guard spoke with the police. (Am. Compl. ¶ 64.) He does not allege what she said, let alone that the guard said anything false to effect his arrest.

As it relates to the female security guard, Sims alleges that she "instigated, advised, and encouraged police before, during, and after plaintiff's arrest as Exhibit A clearly supports." (*Id.* ¶ 67.) Aside from the fact that this allegation is demonstrably untrue "as Exhibit A clearly supports,"[13] that allegation is nothing more than a "formulaic recitation of the elements of [the] cause of action," which "will not do" to state a claim. *Twombly*, 550 U.S. at 555 (2007). Sims's allegations are nothing more "than an unadorned, the-defendant-unlawfully-harmed-me accusation," and therefore Count Three must be dismissed. *See Ashcroft*, 556 U.S. at 678.

d.  Count Four: Americans with Disabilities Act

Of all the deficiencies in Sims's complaint, his Americans with Disabilities Act ("ADA") claim is the most egregious. He contends that, after walking into the casino, around the casino floor, to the bar, to the slot machines, and standing to argue with security personnel, once he was being escorted from the premises, his foot became so painful that he could no

---

[13] Exhibit A unquestionably shows all security personnel leaving *before* Sims is arrested. At 10:04:53 (per the timestamp in the top right corner on Exhibit A), the final security guard, the female that Sims in unable to accept is a supervisor, leaves Sims with a Danville police officer. Although Sims fast forwards through much of the video, she does not reappear. Rather, he continues to argue with police until he is ultimately arrested at 10:10:01. (Am. Compl. Ex. A.)

longer walk, so he demanded a wheelchair.[14] The refusal to provide him one, he claims, violated the ADA. Obviously it did not. *See* 28 C.F.R. § 36.306 (noting that the ADA "does not require a public accommodation to provide its customers, clients, or participants with personal devices, such as wheelchairs"). But setting aside the frivolousness of this claim,[15] it is time barred.

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). "Because the ADA does not specify a statute of limitations for claims under . . . Title III, district courts must adopt the most analogous state statute of limitations." *Lewis v. Aetna Life Ins. Co.*, 993 F. Supp. 382, 385 (E.D. Va. 1998). In Virginia, the most analogous statute is the Virginia Rights of Persons with Disabilities Act, which contains a one-year statute of limitations. Va. Code Ann. § 51.5-46(B); *A Soc'y Without a Name for People Without a Home Millennium-Future-Present v. Virginia*, 699 F. Supp. 2d 787, 799 (E.D. Va. 2010). Accordingly, "[t]he statute of limitations for ADA claims in Virginia is one year." *Norwood v. Oak Hill Acad.*,

---

[14] Exhibit A shows that Sims was perfectly able to walk and talk with police officers for over 10 minutes once he finally was removed from the casino and was perfectly able to resist arrest and fight with officers once he was placed in handcuffs. (*See* Am. Compl. Ex. A.)

[15] To state a claim under Title III of the ADA, Sims must also allege that he was disabled under the ADA. *See J.D. v. Colonial Williamsburg Found.*, 925 F.3d 663, 669–70 (4th Cir. 2019). "A person is disabled within the meaning of the ADA if []he (1) has 'a physical or mental impairment that substantially limits one or more major life activities;' (2) has a record of such impairment; or (3) has been 'regarded as having such an impairment.'" *Alexander v. QVC Distrib. Ctr.*, 678 F. Supp. 2d 337, 344 (E.D. Va. 2009) (quoting 42 U.S.C. § 12102(2)). Presumably, Sims would argue that he was substantially limited in the major life activity of walking. *See* 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i). But Exhibit A definitively establishes that he was not. *Preferring not to walk* is markedly distinct from being *substantially limited in one's ability to walk*, which Sims was not. And if the video evidence before he was removed from the casino left that question unanswered, the video of him walking, talking, and fighting with the police outside the casino leaves no doubt. (*See* Am. Compl. Ex. A.)

No. 7:17-cv-222, 2017 WL 8315919, at *2 (W.D. Va. Dec. 22, 2017), *R.&R. adopted as modified by* 2018 WL 1461503, at *2 (W.D. Va. Mar. 23, 2018).

Here, Sims's encounter at Caesars occurred on June 11, 2023, but he did not bring suit until May 20, 2025, well past the one-year deadline to do so. Accordingly, his ADA claim is barred, a conclusion Sims does not seriously contest. (*See* Pl.'s Br. in Opp. at 4 [ECF No. 23] ("Despite the time bar on the ADA reasonable accommodation claim, the security staff's deliberate indifference to the needs of patron warrants scrutiny.").) Count Four will be dismissed as well.

## IV.    CONCLUSION

For these reasons, Sims's complaint fails to state a plausible claim to relief under state or federal law. This case will be dismissed.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 31st day of March, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

- 15 -